434

*John McArthur* and *Merril R. Reller,* for plaintiff in
error.

*Clarence S. Beck,* Attorney General, and *Cecil S. Bru-
baker,* for defendant in error.

Heard before SIMMONS, C. J., CARTER, MESSMORE,
YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CARTER, J.

This is a petition in error by the defendant Caril Ann
Fugate seeking a review of an order of the district
court for Lancaster County denying a new trial on the
ground of newly discovered evidence. A previous peti-
tion in error based on errors alleged to have occurred
at the trial was before the court in Fugate v. State,
*ante* p. 420, 99 N. W. 2d 868. The record of the

trial in that case was received in evidence in the proceeding presently before the court, together with the affidavits received and testimony taken at the hearing on the motion for a new trial on the ground of newly discovered evidence.

It is contended that the new evidence discovered after the trial shows that the State knowingly used perjured testimony in the prosecution of Caril Ann Fugate for first degree murder. The applicable rule is: The use of false testimony or the suppression of evidence in a criminal case, which is within the knowledge of the prosecution, ordinarily constitutes a denial of due process of law when it is material to the guilt or innocence of the accused or to the penalty to be imposed. Such rule ordinarily applies where the suppression of evidence or the use of false evidence goes only to the credibility of the witness. Napue v. Illinois, 360 U. S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217; Alcorta v. Texas, 355 U. S. 28, 78 S. Ct. 103, 2 L. Ed. 2d 9; Pyle v. Kansas, 317 U. S. 213, 63 S. Ct. 177, 87 L. Ed. 214; People v. Savvides, 1 N. Y. 2d 554, 136 N. E. 2d 853.

The evidence in support of the motion for a new trial rests primarily on the affidavits of Otto Glaser and Jeff Wheeler who were at the time of the events about which they testified inmates of the penitentiary. The substance of their affidavits is as follows: Affiants were occupants of room 4 in the hospital ward of the penitentiary from October 14, 1958, until after the trial of Caril Ann Fugate. Charles Starkweather, under sentence of death for the murder of Robert William Jensen, was held in room 5, the room immediately adjacent to that occupied by affiants. Immediately after October 14, 1958, Starkweather was treated the same as other prisoners in that he did not have access to newspapers, radio, and television. He was limited in cigarettes and restricted in favors extended, the same as other prisoners. About the time of the trial of Caril Ann Fugate, Starkweather was granted numerous special

favors. He was permitted to receive a daily newspaper and received cartons of cigarettes and candy. He had as many as 5 cartons of cigarettes of different brands and different kinds of candy. He was permitted to listen to the radio and watch television. He ordered and received coffee at will and was permitted to bathe whenever he desired instead of twice a week as the rules permitted. Affiants state that about a week before the trial of Caril Ann Fugate was commenced, three persons who were unknown to them were in constant attendance at the door of Starkweather's room. They assert that one or more of these three persons were present constantly every day, even during meal periods. They overheard these persons say that a great deal depended on him at the trial; that there were certain things he must not say and other things he must say. One of said persons told Starkweather that he would not get the electric chair if he said exactly what he was told to say in the Fugate case and that the county attorney was a man of his word and would see to it that he would not get the chair. They state that Starkweather said he almost killed Caril Ann Fugate in the Bartlett, Meyer, and Ward homes, and that he intended to kill her in Wyoming, all of which was because of her attempts to escape. They state further that the three unknown persons had a spirited quarrel with Starkweather about his testimony with reference to the killing of Robert William Jensen and that they insisted he must testify as he was told and the county attorney would then save him from execution. They state also that the three unknown persons attempted to inflame Starkweather against Caril Ann Fugate by quoting her as saying that he was bow-legged and liked to play cops and robbers and cowboys, that he could not dance, and that she thought him insane. They state that Starkweather was pleased at defendant's conviction for first degree murder and that he was disappointed only that she did not get the death sentence.

The evidence of special favors to Starkweather was corroborated to some extent by one Rigsbee, who was an inmate at the time, and by one Hefner, a former employee at the penitentiary who had been discharged.

The state filed counteraffidavits. Charles Starkweather stated by affidavit that he was visited regularly by his parents and other relatives three or four times a week and that he was assigned visiting hours other than those generally assigned. He stated that a guard was constantly outside the door to his room. He was denied requests for newspapers, radio, and television until after his conviction, after which they were made accessible to him. He stated that he was visited twice by the county attorney and he agreed to testify in the Fugate case on both occasions. He denied that any promises of leniency were made to him, or that promises of favors were made or granted to him. He stated that the county attorney asked him to tell the truth and not to volunteer any statements on direct examination as to any of the killings except that of Robert William Jensen. He stated that he received a daily newspaper after the Fugate trial as a result of arrangements made by a newspaper reporter. He further stated that he received candy and cigarettes from his parents in small quantities except for one carton of cigarettes that he received for Christmas. He stated that he received coffee the same as other prisoners and had bathing privileges twice a week the same as other inmates. He denied talking with anyone outside his door concerning the Fugate trial or the testimony that he would give. He said further that the county attorney made no promises of leniency but affirmatively told him he should not expect to gain any benefit from appearing as a witness. He stated that he told the guard he was sorry for the defendant when he heard of the verdict by radio, a fact corroborated by the guard's affidavit. He denied the alleged conversations with Glaser and Wheeler, and the three unknown per-

sons. He stated that he was promised no benefit for testifying by the county attorney or any other person. He stated further that he applied to the Board of Pardons for a commutation of his death sentence and that the county attorney made no appearance before the board.

The warden of the penitentiary stated by affidavit that Starkweather, prior to his conviction, was kept in a locked room with a barred door and a guard posted outside, and that after his conviction regular privileges were accorded him when they were first requested by an interested newspaper reporter. He asserted that no special favors were granted to Starkweather and that no request was ever made by the county attorney for anyone connected with the penitentiary to grant such or to discuss with Starkweather the evidence he would give at the Fugate trial.

The warden's affidavit is corroborated by the affidavits of the deputy warden, the associate warden, the newspaper reporter, and a guard who was posted outside Starkweather's room. The county attorney also corroborated many of the statements made by Starkweather and the other affiants produced by the State. He positively denied making any promises of any kind to Starkweather and advised him only to tell the truth and to confine himself on direct examination to the details of the Jensen murder. He stated that the granting of access to newspapers, radio, and television was done wholly without his knowledge. He specifically denied that he promised Starkweather he would be saved from execution if he testified in the Fugate case, or that he ever made such a statement to any person whomsoever. He stated also that no request was made by him or any member of his staff that Starkweather's sentence be commuted, or that clemency be granted.

Upon this evidence the defendant contends that the prosecution knowingly used the false testimony of

the witness Starkweather and that the defendant has been denied due process of law as a result thereof.

The evidence discloses that the witness Starkweather had made conflicting statements regarding the numerous killings he had committed, all of which were known to the defense at the trial. There is no evidence in this record that the prosecution used any evidence known to be false. The evidence of the county attorney and the witness Starkweather is to the effect that the county attorney advised Starkweather to tell the truth and to confine his evidence on direct examination to the killing of Robert William Jensen for whose murder the defendant was on trial. The duty is imposed upon a prosecutor to produce all evidence tending to establish the guilt or innocence of the accused. Starkweather had been convicted of first degree murder for the killing of Robert William Jensen and clearly had knowledge of the facts concerning the crime. The record, however, does not show even remotely that the prosecutor used Starkweather with any knowledge that he would testify falsely. It was known, of course, as a result of Starkweather's trial, that the testimony of Starkweather, whatever it might be, could be impeached by conflicting statements which he had made orally and in writing. But his credibility as a witness and the weight to be given his evidence was for the jury. The use of the witness Starkweather under the circumstances shown does not constitute a use of testimony known to be false by the prosecution, and it is not within the cited rule.

It is urged that the evidence of Glaser and Wheeler shows the use of false testimony and the suppression of adverse evidence on the part of the prosecution. These two witnesses testified that three persons during all hours of the day for several days coerced Starkweather into testifying falsely. They were unable to name or describe any of the three persons. The evidence is that the room occupied by Starkweather was guarded

at all times by a guard posted outside his door. The officers of the penitentiary deny that the acts occurred to which these witnesses testified. The witness Starkweather also denied that they occurred. The evidence of these two witnesses appears incredulous when it is considered that it allegedly occurred without the knowledge of officials or employees in a carefully guarded penitentiary with a prisoner condemned to death and closely watched for that reason. In any event, there is not the semblance of evidence that the prosecution had any information concerning the acts or doings of the three unknown persons.

We fail to find any evidence in the record which in any manner justifies the assertion that the county attorney in calling Starkweather as a witness knowingly used false evidence, or suppressed evidence in the case. The alleged evidence, if it was admissible for any purpose, was admissible only to impeach the credibility of Starkweather. It is the rule that a new trial will not be granted on the ground of newly discovered evidence when the only effect of the evidence is to impeach or discredit a witness. Baskins v. State, 139 Neb. 803, 299 N. W. 188.

The granting or refusal of a new trial rests in the sound discretion of the trial court, and its ruling thereon will not be disturbed unless there has been a clear abuse of such discretion. Lee v. State, 124 Neb. 165, 245 N. W. 445; Baskins v. State, *supra*. The trial court in the instant case, in the exercise of such discretion, concluded that no basis existed for granting a new trial. We fail to see how the trial court could have properly arrived at any different conclusion. The judgment of the trial court in denying a new trial on the ground of newly discovered evidence is therefore affirmed.

AFFIRMED.