**Caril Ann FUGATE, Petitioner,**

v.

**Madolyn GAFFNEY, Respondent.**

**No. 1307 L.**

United States District Court,
D. Nebraska.

May 7, 1970.

**130**

John McArthur, Lincoln, Neb., for plaintiff.

Melvin K. Kammerlohr, Asst. Atty. Gen., Lincoln, Neb., for respondent.

## FINDINGS AND OPINION

ELMO B. HUNTER, District Judge.

Caril Ann Fugate, who is incarcerated in the Women's Reformatory at York, Nebraska, filed on December 5, 1967, in District Court for the District of Nebraska a petition for a writ of habeas corpus. In her petition she contends she suffered in the Nebraska state court a conviction and life sentence for first degree murder that should be invalidated and set aside because her conviction was obtained in violation of certain of her constitutional rights as will be later detailed and discussed. Eventually, both of the federal district court judges of Nebraska disqualified themselves, and on January 19, 1970, the undersigned judge was designated and authorized to process and decide this case.

On February 6, 1970, a full evidentiary hearing was accorded petitioner and respondent. At that hearing Miss Fugate and her counsel, John McArthur, testified. Additionally, the entire transcripts and records of the prior state court actions were introduced in evidence.

An examination of the record in the instant case convinces that there has been substantial exhaustion of all state court remedies and it is in the public interest, as all parties concede, that this post-conviction remedy action be entertained and decided by the undersigned court.

### Background

There is no serious dispute concerning much of the factual background leading up to the present case. Miss Fugate, who was then fourteen years old, was a companion of and stayed and traveled with Charles Starkweather for a nine

day period during a series of heinous killings, some eleven in number, that took place in and around Lincoln, Nebraska, in January, 1958. She accompanied Starkweather in his efforts to elude the authorities. They were eventually apprehended in Wyoming on January 29, 1958.[1] She was charged in a two count indictment, the second count alleging that she did unlawfully, feloniously, and purposely in the perpetration of a robbery, kill Robert William Jensen. Her conviction on Count II and life sentence thereon is the subject of her present post-conviction challenge.[2]

### Petitioner's Current Contentions

In this case petitioner renews certain contentions of alleged constitutional error that she presented in her state post-conviction action and in her other various state court actions.[3] These present contentions which she claims, violated her fifth, sixth and fourteenth amendment rights are:

1. That at her trial for first degree murder she was wrongfully deprived of the services of counsel of her selection; namely, Mr. Merril R. Reller, now deceased.

2. That a juror made a pretrial bet that she would receive the death penalty, thereby depriving her of a fair and impartial jury as guaranteed by the sixth amendment to the Constitution of the United States.

3. That the news media publicity deprived her of a fair trial.

4. That certain incriminating admissions and confessions used against her at her trial were obtained from her by duress, and in the absence of her having counsel to represent her.

5. That she was wrongfully induced to waive her extradition rights and to return to the State of Nebraska from the State of Wyoming.

6. That she was required to be arraigned and to enter a plea without assistance of counsel.

7. That she was induced by trickery and deceit to write a letter for law enforcement officers to be used by them to induce a witness to testify against her.

8. That the state knowingly used perjured testimony in the trial.

9. That the totality of all the circumstances was such that she was wrongfully deprived of her constitutional rights, of due process of law and of a fair trial.

### Federal Standards of Review

The federal standards of review in post-conviction actions concerning state criminal cases are articulated in the trilogy and in more recent federal cases such as Kaufman v. United States, 394 U.S. 217, 89 S.Ct. 1068, 22

---

1. Starkweather, following his conviction, was executed by the State of Nebraska.

2. Miss Fugate has served approximately twelve years of her sentence, and, according to her testimony, is now eligible for parole consideration by the State of Nebraska, but has no present intention of seeking such consideration until after and if she fails in the present action.

3. The case that resulted in her conviction was tried in the Nebraska District Court (State Trial Court), appealed and affirmed in the Nebraska Supreme Court. See, Fugate v. State, 169 Neb. 420, 99 N.W.2d 868 (1959). Thereafter, it was again reviewed by the Nebraska Supreme Court on the grounds asserted in Miss Fugate's motion for a new trial based on newly discovered evidence. See, Fugate v. State, 169 Neb. 434, 99 N.W.2d 874 (1959). Thereafter, Nebraska enacted its present statutory post-conviction procedure, and Miss Fugate's case was given a post-conviction evidentiary hearing by the Nebraska District Court. See, State v. Fugate, 180 Neb. 701, 144 N.W.2d 284 (1966). She appealed to the Nebraska Supreme Court from the adverse judgment, and the Nebraska Supreme Court, on review, affirmed the Nebraska District Court. See, Nebraska v. Fugate, 182 Neb. 325, 154 N.W.2d 514 (1967). She then brought the present action.

L.Ed.2d 227 (1969).[4] Broadly stated, the inquiry is whether the state prisoner is in custody in violation of the Constitution or laws or treaties of the United States. See, 28 U.S.C. Section 2254(a) and 28 U.S.C. Section 2254(d) as amended. The more particular inquiries will be discussed as each of petitioner's contentions are examined. It is the duty of the reviewing federal court to make its own independent determination on *federal questions*. See, In Matter of Parker, 423 F.2d 1021 (8th C.C.A. 1970); Doerflein v. Bennett, 405 F.2d 171 (8th Cir. 1969).

■ In a federal habeas corpus proceeding under 28 U.S.C. Section 2254(d) as amended it is provided that the state court determination of a *factual issue* "shall be presumed to be correct" unless the applicant establishes a circumstance, therein enumerated, which proves the unreliability of the state proceeding. See, In the Matter of Parker, supra, and its numerous citations on this point. Of course, the presumptive correctness of the state court's finding is always rebuttable. See, Brown v. Crouse, 399 F.2d 311 (10th Cir. 1968), and the Triology cases.

### Contention of Deprivation of Counsel of Own Selection

■■ First to be examined is petitioner's contention that she was deprived of the full services of counsel of her own choice.[5] The facts involved are relatively undisputed.

The record discloses that about the time of petitioner's arraignment, it being apparent that she needed an attorney to represent her, she filed a motion and affidavit under oath stating that she was without funds or resources to obtain, employ and pay counsel and requested the court to appoint an attorney to defend her. She did not suggest the name of any particular attorney but left the selection to the court.

Pursuant to her written request, Nebraska District Court Judge Harry A. Spencer (now Associate Justice of the Supreme Court of Nebraska) by written order appointed John H. McArthur, of the Lincoln, Nebraska bar, to represent her. Mr. McArthur has represented petitioner from that time to and including the present time. At the time of his appointment Mr. McArthur had been an active practicing attorney for some twenty-three years and was then forty-eight years old. He was experienced in both civil and criminal matters. He immediately began preparation of petitioner's defense and from then on worked diligently on her case.

Officing with Mr. McArthur was another lawyer, Mr. Merril R. Reller, now deceased. Mr. McArthur and Mr. Reller were not partners but with varying frequency occasionally assisted each other in some legal matters and in some cases,

4. Townsend v. Sain, (1963) 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770; Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); Sanders v. United States, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1964); and see, 28 U.S.C. § 2254.

5. The sixth amendment to the Constitution of the United States provides in part: "In all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defence." As stated in Gideon v. Wainwright, 372 U.S. 335, 339, 83 S.Ct. 792, 794, 9 L.Ed. 2d 799, this is construed "to mean that * * * counsel must be provided for defendants unable to employ counsel unless the right is competently and intelligently waived." Such assistance of counsel is one of the safeguards the sixth amendment deemed necessary to insure fundamental human rights of life and liberty. Other cases hold the indigent accused must be given competent counsel and the effective assistance of counsel. See, Ferguson v. Georgia, 365 U.S. 570, 81 S.Ct. 756, 5 L.Ed.2d 783 (1961). The sixth amendment right to the assistance of counsel not only applies to federal prosecutions, but also is made obligatory upon the states by the fourteenth amendment. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792 (1963); Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); Burgett v. Texas, 389 U.S. 109, 88 S.Ct. 258, 19 L.Ed.2d 319 (1967).

making a separate arrangement each time as to whether it was just an informal exchange of services or on a fee-sharing or pay basis. Each had his own independent practice. Mr. McArthur soon after his court appointment asked Mr. Reller to assist him. Thereafter, Mr. Reller had considerable contact with petitioner and assisted in preparing her case, including some work with potential witnesses, and with proposed voir dire questions and instructions.

On the morning the trial commenced Mr. Reller and Mr. McArthur appeared, and Mr. Reller took the front chair at the counsel table with Mr. McArthur seated behind him. Judge Spencer called Mr. Reller into his chambers, explained to him that he had officially appointed Mr. McArthur as Miss Fugate's counsel, and that he expected Mr. McArthur to conduct the voir dire examination, also all of the examining and cross-examining of the witnesses, make the objections and the closing arguments. He advised Mr. Reller that he could sit behind Mr. McArthur and counsel and advise him in any way he desired, and assist Mr. McArthur fully in that capacity.[6]

Mr. Reller sat behind Mr. McArthur throughout the trial, consulted with him and with Miss Fugate frequently, made suggestions to Mr. McArthur regarding the voir dire examination, the examination of witnesses, the instructions and other matters, and generally assisted Mr. McArthur in the trial of the case.[7]

At the hearing on the instant case Mr. McArthur candidly testified that he could not think of anything that he was prevented from doing, or that prejudiced his representation of Miss Fugate at the original trial that could be attributed to Mr. Reller not being permitted to conduct the voir dire, examine witnesses or make the objections. Rather, at most, McArthur believed Mr. Reller may have been better prepared to conduct the voir dire and to examine Miss Fugate, but conceded he had the constant advice and counsel of Mr. Reller as these events occurred.

While there is some showing that Miss Fugate had developed confidence in Mr. Reller, there is no showing that she or Mr. McArthur ever requested Judge Spencer to appoint Mr. Reller as co-counsel in the case.[8] Judge Spencer's only knowledge of Mr. Reller's situation came for the first time on the morning trial commenced and then only from Mr. Reller.

Examination of the transcript of the trial reveals Judge Spencer had indeed

6. Judge Spencer testified "It is my recollection that I told Mr. Reller, as I had appointed you, Mr. McArthur, as counsel to defend Caril Ann Fugate, that I had no objections to his helping you, but that help did not take the form of his examining witnesses or participating in the trial to the extent of making objections; if he had any objections they needed to be made through you, because you were the court-appointed counsel, and I wanted to make sure you were the one who conducted the trial. * * * I told him there would be no objection to his presence, and in his helping in every way in the preparation of the case * * * that I was trying to protect her rights; that in my judgment you were one of the outstanding lawyers handling criminal cases, and I wanted to be sure you were the one that handled this case." Reller was asked: "Q. Did you ever seek appointment by the Court as her attorney? A. I did not."

7. Reller did not relate to McArthur his conversation with Judge Spencer until after the trial. He simply moved to the second chair and motioned McArthur to the front chair at the counsel table. Compare, Rolon Marxuach v. United States, 398 F.2d 548, 551 (5th Cir. 1968).

8. Miss Fugate testified in February, 1968, at her state post-conviction hearing that she had asked Mr. McArthur to have Mr. Reller visit her and Mr. Reller a day or two later commenced seeing her. Over sustained objection her counsel made an offer of proof she would say she made an "arrangement" with Mr. Reller to represent her. Obviously, she did not mean she wanted Mr. McArthur replaced. Judge Spencer was not advised of this "arrangement". As explained above, Mr. Reller did assist in the preparation for trial, and was present at the counsel table throughout the trial and assisted Mr. McArthur.

selected and appointed competent counsel for Miss Fugate. Mr. McArthur handled her defense in a very able and experienced manner, obviously had prepared diligently for all phases of the trial, including examination of Miss Fugate as a witness in her own behalf, and exhibited both intelligent and sound trial strategy as he vigorously represented her throughout the entire trial.

■ It is the undersigned judge's finding (as was the state court of Nebraska) that Miss Fugate was not denied trial counsel or co-counsel of her selection. At her request and because she appeared financially unable to employ counsel the court appointed competent counsel (Mr. McArthur) who was fully acceptable to Miss Fugate. Although not advised until the trial was ready to commence that Mr. Reller also desired to participate on Miss Fugate's behalf, Judge Spencer permitted Mr. Reller to assist and advise Mr. McArthur, as described. In what he deemed to be in Miss Fugate's best interests, Judge Spencer exercised a sound discretion under the circumstances, and there is no showing that his handling of the counsel situation in any way prejudiced Miss Fugate. The related circumstances do not show any denial of any constitutional right of Miss Fugate regarding her right to counsel or co-counsel, and her legal representation throughout the trial.

### Contention of Not Being Advised of Charges

Petitioner also claims that she was not informed of the charges against her prior to or at the time of her waiver of extradition, and that after she was taken to Nebraska she was charged with a different murder.

■ As shown by the record, and as found by the Nebraska Supreme Court, she was told while she was in the Wyoming jail that murder charges were pending against her and Starkweather in Lincoln, Nebraska.[9] This was told to her by Elmer M. Scheele, the County Attorney for Lancaster County, Nebraska, who also advised her that another charge might be filed. Shortly thereafter the murder charge on which petitioner was tried was filed, and she was advised of that. These events do not show any violation of plaintiff's constitutional rights.

### Contention of No Counsel At Arraignment

■ Little need be said concerning this contention. Petitioner was appointed counsel as above discussed. There is no clear showing that she requested one earlier to represent her at the arraignment held on February 3, 1958. She was advised at the time she was to be returned from Wyoming to Nebraska she had the right to have counsel appointed to assist her, but she stated she doubted if one would be interested in representing her. At her hearing before the county court judge she made no incriminating statements, and she entered a plea of not guilty.[10] There were no defenses required to be raised in that proceeding. No prejudice resulted from the arraignment.

As presented by the present record [11] there is no showing that the arraignment proceeding was in a critical stage of the criminal proceedings as expressed in Powell v. Alabama, 287 U.S. 45, 53

---

9.  State v. Fugate, 182 Neb. 325, 154 N.W. 2d 514, 516. Scheele is now District Judge of the Third Judicial District, State of Nebraska. He testified in the state post-conviction hearing as follows: "I then told her that there was a first degree murder charge pending against her and Starkweather in Lincoln, and that I was there to take her back to face that charge, *or another charge that might be filed*" (emphasis added).

It is clear from the record that Miss Fugate knew of these deaths which occurred during the period she and Starkweather were together.

10. And see, Neb.Rev.Statutes, Sec. 29–506 (Reissue 1964); Sigler v. Bird, 354 F. 2d 694 (8 CCA 1966).

11. For the sequence of events see, Fugate v. Ronin, 167 Neb. 70, 91 N.W.2d 240, 242 (1958).

S.Ct. 55, 77 L.Ed. 158 (1932); and in the later cases such as Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); Ronzzo v. Sigler, 346 F.2d 565 (8 C.C.A. 1965); Com. of Pa. ex rel. Whiting v. Cavell, D.C., 244 F.Supp. 560, aff. 358 F.2d 132, cert. den. 384 U.S. 1004 and 1009, 86 S.Ct. 1921, 1986, 16 L.Ed.2d 1018, 1021; Miller v. Warden, 4 Cir., 338 F.2d 201 (1964), and cases cited therein; Annotation, 5 A.L.R.3rd 1269. Under these facts, there was no violation of any of petitioner's constitutional rights.' See, McGill v. United States, 121 App.D.C. 179, 348 F.2d 791; Nolan v. Nash, 316 F.2d 776 (8 Cir. 1963), cert. den. 375 U.S. 924, 84 S.Ct. 269, 11 L.Ed.2d 166; United States ex rel. Cooper v. Reincke, 333 F.2d 608 (2nd Cir. 1964), cert. den. 379 U.S. 909, 85 S.Ct. 205, 13 L.Ed.2d 181; DeToro v. Pepersack, 332 F.2d 341 (4 Cir. 1964), cert. den. 379 U.S. 909, 85 S.Ct. 198, 13 L.Ed.2d 181; Ronzzo v. Sigler, 235 F. Supp. 839 (D.C.Neb.1944); In Matter of Parker, 423 F.2d 1021 (8 Cir. 1970).

### Contentions Concerning Pretrial Publicity

The series of killings of residents of Lincoln, Nebraska, and environs involving Starkweather and petitioner was so shocking as undoubtedly to cause considerable publicity both locally and to some extent nationally. No claim was made at the trial of petitioner on her murder charge that newspaper or other news media publicity prejudiced any of her rights, or had affected her right to an opportunity for a fair trial. Nor was any such claim made on petitioner's behalf in any of the several after trial motions for a new trial.

In her state post-conviction action on February 28, 1967, petitioner was asked by her attorney whether "at every court appearance there were flood lights, flash bulbs and people closely about the courtroom and adjacent area." [12] There is no showing or claim that any such events occurred in the courtroom. Examination of the trial transcript convinces that the trial was orderly and was impartially conducted. There is a total absence of even a suggestion that newsmen or others in any way bothered or interfered with petitioner or with her counsel's ability and opportunity to properly present her case and defense in an orderly and dignified courtroom atmosphere. Nor is there any showing in that record that petitioner was deprived of a fair trial as a result of pretrial or trial publicity.[13]

In the present post-conviction proceeding in which petitioner and her counsel were granted a full evidentiary hearing, neither petitioner nor her counsel offered any evidence concerning news media publicity during or before her criminal trial. Thus, the present record which includes all her prior trial and hearings records fails to disclose any prejudice to petitioner or to her counsel from publicity in the trial of her criminal case.[14] Nor are the facts in the instant case in any way comparable to those in Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) or Rideau v. Louisiana, 373

12. The trial court ruled this subject was beyond the scope of that hearing, whereupon petitioner's counsel offered to prove her answer would be, "there was", and that the flash bulbs bothered her eyes so she wore dark glasses and was afraid. There is evidence in the record that in the courtroom she wore her regular glasses which had been brought to her by her married sister.

13. The trial judge on numerous occasions instructed the jury that their verdict could be based only on the evidence introduced in the case, and that they must restrict their deliberations to that evidence. He instructed the jury regularly not to read newspapers, or read or listen to any news media throughout the trial, and generally exercised care to prevent their consideration of anything not in evidence.

14. The contentions concerning juror H. A. Walenta will be separately discussed. See, Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), which were cited by petitioner.

Based upon an independent evaluation of all the pertinent circumstances and facts, the undersigned judge finds petitioner's claim of denial of her constitutional right to a fair trial because of publicity to be without merit.[15]

### Contention Concerning Juror's Bet

It is petitioner's contention that juror H. A. Walenta before her trial commenced placed a wager of money with a friend to the effect petitioner would be sentenced to the electric chair, and that the participation of Walenta as a juror deprived her of a trial by an impartial jury as guaranteed by the sixth amendment. This contention was before the Nebraska State District Court in a motion for new trial and before the Nebraska Supreme Court on petitioner's appeal from the denial of a new trial.[16] Both courts made particularized findings of fact and held that under the facts involved petitioner's sixth amendment constitutional rights were not violated.

The facts are relatively undisputed and are disclosed by the affidavits in the record.[17] Richard Weilage, then thirty-one years old and living on a farm in Saline County, Nebraska, stated that on Saturday, October 25, 1958, he went pheasant hunting near Geneva, Nebraska, with H. A. Walenta, operator of the Crete Motor Parts Company, Crete, Nebraska, prior to the selection of the jury in the Fugate case. It was "after a radio or television broadcast concerning Charles Starkweather and Caril Ann Fugate, that affiant [Weilage] said in effect, 'I'll bet a dollar she won't get the electric chair', and Mr. Walenta said in effect, 'I'll bet a dollar she does.' Affiant [Weilage] further states that the 'bet' remark was a spontaneous passing remark and that this affiant did not consider it to be a serious bet at the time and dismissed it from his mind and never mentioned it to Mr. Walenta during the trial, nor did this affiant talk to Mr. Walenta during the trial, nor did this affiant talk to Mr. Walenta about the trial while Mr. Walenta was on the jury panel.

"Affiant further says that it is his [Weilage] and Mr. Walenta's manner of speaking to say in effect 'I will bet you * * *'; that during the past years that type of remark has passed between affiant and Mr. Walenta on many occasions and while 'bet' remarks have passed between affiant and Mr. Walenta, neither has considered that type of remark serious, and neither has ever paid the other any money on account of the same; affiant has on many occasions in Mr. Walenta's store in Crete, said, 'I'll bet you can't find a part' or, 'I'll bet you don't have a part' and 'bet' remarks of that nature and that both affiant and Mr. Walenta have made the same 'bet' remarks on other things, but that throughout the years, neither affiant nor Mr. Walenta considered the same seriously; and that at the time said 'bet' remark was made in regard to the Fugate case that neither considered the same serious."

Juror Walenta by affidavit substantiated Weilage's statement of it and gave the following further explanation: that after the "bet" incident, "Affiant [Walenta] was called to sit on the jury of Caril Ann Fugate; that affiant testi-

---

15. See, United States v. Armone, 363 F.2d 385, 394 (CA 2d 1966) cert. den. 385 U.S. 957, 87 S.Ct. 398, 17 L.Ed.2d 303; United States ex rel. Darcy v. Handy, 351 U.S. 454, 76 S.Ct. 965, 100 L.Ed. 1331 (1956); Stroble v. California, 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872 (1952), reh. den. 343 U.S. 952, 72 S.Ct. 1039, 96 L.Ed. 1353; Buchalter v. New York, 319 U.S. 427, 163 S.Ct. 1129, 87 L.Ed. 1492 (1943).

16. See, Fugate v. State, 169 Neb. 420, 99 N.W.2d 868 (1959). The trial commenced October 27, 1958. The verdict was rendered November 21, 1958. The motion for new trial was filed November 29, 1958.

17. The undersigned Judge has examined all of the affidavits and has quoted those he is convinced accurately describe the incident.

fied on voir dire examination that he had expressed an opinion as to the innocence or guilt of Caril Ann Fugate but that he could and would forget and lay aside said opinion and decide the case solely on the evidence presented during the course of said trial. Affiant further states that he did sit upon said jury and listened to the evidence in a fair and impartial manner; that affiant kept an open mind as to the evidence until the case was submitted to the jury for deliberation and that during the deliberation of said case that he followed only the law as given by the court and the evidence as it was presented in court; and that the law as given by the court and the evidence as presented in court were the sole and only determining factors in said juror's determination of said case.

"Affiant further states that in regard to the bet with Richard Weilage that immediately after making the said bet that affiant dismissed it from his mind and had forgotten about said bet until said affiant was reminded of it by a third party some time after the jury had reached its verdict and been discharged by the court. Affiant further states that said bet had absolutely nothing to do with his verdict in the case of the State of Nebraska v. Caril Ann Fugate, and that no time during the trial did said affiant remember said bet and that he would not have remembered it except for its being called to his attention after the verdict was reached and the jury discharged.

"Affiant further states that as far as he is concerned that Caril Ann Fugate received a fair and impartial trial and that his decision was based solely upon the evidence presented in court and the law as given by the court in said case."

Other affidavit evidence clearly showed that juror Walenta had indeed forgotten the "bet" incident, until it was called to his attention after the trial of the case.

The affidavit of the foreman of the jury in the Fugate case sheds further light on the subject. Mr. E. C. Eichelberger, the jury foreman stated, "That he heard all of the voir dire examination made of the prospective jurors prior to the selection of said jury and specifically recalls that juror H. A. Walenta testified on voir dire examination that he had held an opinion as to the innocence or guilt of the defendant founded upon information gathered from news media and not upon conversations with anyone purporting to have first hand information as to the actual facts, or upon conversations with any witnesses of the transactions, and that he felt that he could and stated that he would lay aside any opinion he formerly had, that it would not require any evidence upon the part of either the State or the defense to remove completely from his mind his former opinion, that he would enter upon the trial with a free, open and unbiased mind, would decide the case solely upon the evidence received by the court and the court's instructions as to the law, and that he felt that he could be completely impartial and would return a just verdict in accordance with the law and the evidence.

"That on voir dire examination by defense counsel juror Walenta testified that he had expressed the opinion that he once had held but that he could and would lay it aside and decide the case solely on the evidence and the law.

"Affiant further says that juror H. A. Walenta was not challenged for cause by counsel for either the State or the defendant.

"Affiant further states that during the jury's entire deliberation no member of the jury urged or requested that the dealth penalty be included as part of the jury's verdict and specifically states that juror H. A. Walenta did not mention the death penalty or urge that it be imposed as part of the verdict of guilty."

It is the position of petitioner and her counsel that had they known of the "bet" at the time of the voir dire examination they would have challenged juror Walenta for cause and, if overruled,

would have used a preemptory strike to remove him.

Careful review of all the evidence convinces that based on the mentioned (hearsay) news media incident Walenta had an opinion which he expressed in "bet" terminology, that the jury (unselected and unknown at that time) would assess the death penalty. The parties seemed to assume that a verdict of guilty would be reached by the then unselected and unknown jury.

During the jury selection process Walenta forthrightly stated that he had formed an opinion based on the mentioned publicity. He did not mention the use of the betting terminology. As he explained it, he had forgotten his use of that terminology, and that it was only a means of expressing the opinion he held concerning what a jury would do and indicative to some degree of his own opinion at that moment on guilt and punishment. Petitioner and her counsel were on notice that he had held such an opinion. The evidence convinces that juror Walenta was examined in depth on the voir dire examination concerning his opinion; that petitioner and her counsel were apparently satisfied with his explanation of it; satisfied with his ability to set it aside completely and to hear the case solely on the evidence produced during the trial of the case, and satisfied that he had the ability to disregard all hearsay matters including the mentioned news media reports that had occasioned his remarks to Weilage.

There is no showing that juror Walenta did not give truthful answers to the questions propounded, or that he concealed a known disqualification. He was not challenged for cause, nor by use of petitioner's elective strikes. The decision not to challenge Walenta and to leave him on the jury was made by petitioner and her counsel. Their decision was a deliberate one (trial strategy) based on the described disclosure by Walenta and his explanation that it would not take evidence to remove his hearsay based opinion, and that he could and would enter upon the trial with a free, open and unbiased mind.[18] There is no evidence that juror Walenta did not do so, and the foreman's affidavit indicates neither Walenta nor anyone else ever suggested the death penalty. The trial judge throughout the trial instructed the jury of its duty to restrict its consideration of the case solely to the evidence introduced at the trial.

■■■ The sixth amendment provides the accused shall enjoy the right to a speedy and public trial, "by an impartial jury". A fair trial in a fair tribunal is a basic requirement of due process. In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955). This means the various jurors must not engage in their jury duties with an earlier formed opinion as to guilt. As stated in Irvin v. Dowd (1961) 366 U.S. 717, 722, 81 S.Ct. 1639, 1642–1643, "It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. Spies v. Illinois, 123 U.S. 131 [8 S.Ct. 22, 31 L.Ed.

18. Compare, United States v. Ragland, C.A.2nd 1967, 375 F.2d 471, 475, 476; Spivey v. United States, C.A.5, 1940, 109 F.2d 181, 196; Evans v. State of Arizona, C.A.9, 1969, 410 F.2d 1122, 1124; Carpenter v. United States, 1938, 69 App. D.C. 306, 100 F.2d 716, 717.

80]; Holt v. United States, 218 U.S. 245 [31 S.Ct. 2, 54 L.Ed. 102]; Reynolds v. United States, supra [98 U.S. 145, 25 L.Ed. 244]."

It is, of course, necessary in each particular case that a sound judicial inquiry be made, as stated in Irvin v. Dowd, supra, to determine if there has been a failure to have the impartial jury contemplated by the sixth amendment. And, in a federal post-conviction proceeding such as this, the federal court must make a de novo, independent examination and evaluation to determine whether the juror, or jurors, lacked that impartiality which the sixth and fourteenth amendments require. United States ex rel. Brown v. Smith, 306 F.2d 596, 602, C.A.2nd, 1962. The burden on such issue rests upon the party claiming essential unfairness or constitutional violation. See, Beck v. Washington, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962). The facts involved in this so-called betting incident are not such as to persuade that juror Walenta was disqualified as a matter of law. See, Brown v. United States, C.A. 10, 1966, 356 F.2d 230.

It is the undersigned Judge's finding that upon independent examination and evaluation of the entire question of impartial jury, juror Walenta made a fair disclosure of his earlier opinion and its basis, and the undersigned Judge is persuaded juror Walenta laid aside that opinion *before* he commenced his service as a juror in the trial. There is no evidence that he did not do so, and all indications are that he did. No deprivation of any constitutional rights of the petitioner resulted.

### Contention Regarding Confessions and Admissions

Petitioner contends that before counsel was appointed to represent her, she made numerous incriminating statements and admissions to government personnel that were used against her in her trial. Especially damaging, she says, were statements she made in Wyoming,

and while she was being brought from Wyoming to Nebraska. Similar objection is made to statements obtained from her after her arrival in Nebraska and while she was incarcerated in the state hospital pending her trial.

In support of her contention that all of these incriminating statements and admissions were involuntary and that their trial use resulted in a denial of her constitutional rights (5th amendment) petitioner cites Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed. 2d 325 (1962); Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948); Beecher v. Alabama, 389 U.S. 35, 88 S.Ct. 189, 19 L.Ed.2d 35; Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); and McLeod v. Ohio, 378 U.S. 582, 84 S.Ct. 1922, 12 L.Ed.2d 1037 (1964). She suggests portions of her interrogations and waiver of her constitutional rights were secured by government personnel while she was tired, fatigued and under the influence of drugs.

Examination of the trial transcript reveals the question of the voluntariness of any statement made by Miss Fugate and used at the trial was presented and decided in that trial and affirmed on appeal by the Nebraska Supreme Court. Thereafter, as a result of her post-conviction application, the Nebraska State District Court upon order of the Nebraska Supreme Court, gave her a hearing on the voluntariness question with the opportunity to present additionally any new evidence not in the trial record. She was unsuccessful in the Nebraska State District Court. She appealed to the Nebraska Supreme Court and that court, after reviewing the voluntariness question, ruled against her.

In the present hearing before the undersigned judge petitioner and her counsel were offered opportunity to make any additional record and to adduce evidence on the question of voluntariness. They have contented themselves with introducing the transcripts of the prior trial and post-conviction hearing on this subject.

The undersigned judge has reviewed all of those parts of the mentioned transcripts which contain the evidence on this subject and has come to the independent conclusion that the mentioned incriminating statements and admissions were voluntarily made by petitioner and that their use at her trial did not deprive her of any of her constitutional rights, including her fifth amendment rights. The mentioned incriminatory statements and admissions, and the evidence surrounding their making are too voluminous to permit their being set out in full in this opinion. Reference will be made to pertinent parts that particularly assist in revealing their nature and their voluntariness.

As earlier noted, petitioner and Starkweather were apprehended on January 29, 1958, in Wyoming. The circumstances were that a Wyoming deputy sheriff, William S. Romer, was driving along the public highway between Casper and Douglas, when he came upon Starkweather wrestling with a motorist over the possession of a gun. Suddenly, petitioner ran from the automobile she and Starkweather had occupied to Romer's automobile and began telling about the killings. Her own account of it according to the testimony she gave at her state post-conviction hearing is: "When I ran to this man, (Romer) I tried to tell him what I had seen, and I was so frightened he (Starkweather) was going to kill me then." * * * "Q. How did you feel when they got you into the, when you got into Mr. Romer's car? A. I was trying to tell him about my family, about him killing the young ones, about him killing the teenagers, and about him killing Mr. Meyer, and the people in the Ward house, and that he killed that man, I tried to tell him all of it at once, and it just came out of me." [19]

Obviously, and by her own testimony, petitioner's statement to Romer was completely voluntary on her part. Also, it reveals that at least her initial attitude was to voluntarily tell her version of the numerous killings.

Petitioner was held a brief time in the jail, or jailhome of the Sheriff in Douglas, Wyoming. While there she received a telegram from her married sister, Barbara, which read: "Tell everything you possibly can. Will help you when you return home. Our home is always open to you. We love you very much. Bob and Barbara Von Busch."

Petitioner while in Wyoming was informed by Mr. Elmer M. Scheele that murder charges were pending against her and Starkweather at Lincoln, Nebraska, and that there was need to return her to Nebraska on that or similar charges.

After a short discussion of extradition to Nebraska, to which petitioner consented and signed a waiver of extradition, she was transported by automobile from Douglas, Wyoming to Lincoln, Nebraska, arriving January 31, 1958. Sitting in the back seat of the automobile with petitioner on that trip was Mrs. Gertrude B. Karnopp, the wife of the sheriff of Lancaster County, Nebraska, and the matron in charge of female prisoners. During the trip there was discussion between petitioner and Mrs. Karnopp concerning the killings. Examination of the testimony convinces that all that petitioner said in those informal conversations was voluntary on her part. There is no evidence of any coercion of any type. Rather, petitioner still appeared to want to tell about some of the events involved in the killings and did so without any pressure or inducement.

Petitioner was taken to the State Hospital near Lincoln because the county jail did not have suitable facilities for her detention. On February 1, 1958, she was interviewed by Dale E. Fahrnbruch, a deputy county attorney. Present during the interview were Mrs. Karnopp; the assistant chief of police, Mr. Eugene Masters; the president of Wesleyan University, Dr. Vance Rogers; and the acting assistant superintendent of the hos-

19. Miss Fugate gave similar testimony at her trial.

pital, Dr. Edwin A. Coats. She was told by Mr. Fahrnbruch that she had been charged with first degree murder in the killing of Carol King and that she might be prosecuted for another killing; that she had a right to a lawyer but he (Fahrnbruch) had no way of providing her with a lawyer—that it was up to her to obtain a lawyer at that time—but if she was bound over to the district court for trial and did not have sufficient funds, a lawyer could be appointed for her. Mr. Fahrnbruch also told her that his purpose was to find out what the facts were; that anything she said could be used against her in court, and that she did not have to talk with him if she did not want to. Thereafter, petitioner was from time to time asked questions about the killings by Mr. Fahrnbruch and she answered them. The circumstances clearly reveal that all this occurred in the presence of the entire group, at least one of whom (Dr. Rogers) was a disinterested person present obviously to assure a fair interrogation. There is a complete absence of any threats, coercion or promises. Petitioner's answers were voluntarily given.

The next morning, February 2, 1958, petitioner was again interviewed in the presence of Mrs. Karnopp and Dr. Coats. Again the circumstances show her oral statements were voluntarily given. That afternoon petitioner's father and sister Barbara were at the hospital and visited with her. That evening (February 2, 1958) in the presence of Mrs. Karnopp, Dr. Coats and a court reporter, Audrey Wheeler, a question and answer statement was taken from petitioner by Mr. Fahrnbruch. It was decided to complete the statement the following morning, February 3, 1958, and this was done. Again the circumstances surrounding these transactions clearly show all of petitioner's statements were voluntary.

On the afternoon of February 3, 1958, petitioner was taken before the county judge, arraigned, and entered her plea of not guilty to the two count charge of murder in the first degree. A preliminary hearing was set for March 8, 1958.[20]

On February 5, 1958, the question and answer statements of February 2nd and February 3rd (which had been transcribed by the court reporter) were read to petitioner in the presence of Mrs. Karnopp; Mr. Masters; Edmund D. Belsheim, the Dean of the Nebraska Law School; and William D. Blue, an attorney. Petitioner conferred with Dean Belsheim and Mr. Blue before the statement was read to her, and they advised her not to sign the statement or make any written corrections and that whatever corrections were made should be made orally.[21] The statement was then read to petitioner and she orally made a number of corrections. Examination of the relevant portions of the transcript shows an absence of any persuasive evidence of lack of voluntariness. Petitioner's counsel stresses the youth of petitioner, her lack of an attorney at the time of the taking of various of the statements, and the atmosphere surrounding her stay in the county hospital where she could see electrical shock treatments being given to some hospital patients.[22] While all these are entitled to be con-

---

20. On March 8, 1958, by agreement, the preliminary hearing was continued to March 29, 1958. Meanwhile through her attorneys, John McArthur and Edmund O. Belsheim, Miss Fugate unsuccessfully sought a writ of prohibition seeking to be processed as a juvenile in the juvenile court. See, Fugat v. Ronin, 167 Neb. 70, 91 N.W.2d 240.

21. Along with attorney John McArthur, Dean Belsheim appeared as her counsel in Fugate v. Ronin, supra.

22. Miss Fugate was never threatened with any shock treatment. She was unable to state she had ever seen any *prior* to her statements in question. The atmosphere of her room and her freedom to visit around, as well as her day to day treatment by hospital personnel clearly shows a lack of any abuse, threat, coercion or other conduct that might have affected her otherwise voluntary conduct in making the statements in issue. There was obvious effort on the part of the authorities to treat her kindly and fairly and to preserve her rights.

sidered as factors tending to prove the involuntariness of the statements and admissions, neither individually, nor in the aggregate in the light of all the surrounding circumstances do they persuade that petitioner acted other than voluntarily in the giving of the mentioned statements and answers.

In 1958 the test for voluntariness was whether the particular statement, admission or confession was voluntarily made when the "totality of the circumstances" is considered. See, Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959); Blackburn v. Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960); Rogers v. Richman, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961); Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961); Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963).[23]

As stated in Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1965), loc. cit. 730, 86 S.Ct. loc. cit. 1779: " * * * Our case law on coerced confessions is available for persons whose trials have already been completed, providing of course that the procedural prerequisites for direct or collateral attack are met. See Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed. 2d 837 (1963). Prisoners may invoke a substantive test of voluntariness which, because of the persistence of abusive practices, has become increasingly meticulous through the years. See Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 1948 (1961). That test now takes specific account of the failure to advise the accused of his privilege against self-incrimination or to allow him access to outside assistance. See Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); Spano v. People of State of New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959). Prisoners are also entitled to present evidence anew on this aspect of the voluntariness of their confessions if a full and fair hearing has not already been afforded them. See Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). Thus while Escobedo and Miranda provide important new safeguards against the use of unreliable statements at trial, the nonretroactivity of these decisions will not preclude persons whose trials have already been completed from invoking the same safeguards as part of an involuntariness claim.

"Nor would retroactive application have the justifiable effect of curing errors committed in disregard of constitutional rulings already clearly foreshadowed. We have pointed out above that past decisions treated the failure to warn accused persons of their rights, or the failure to grant them access to outside assistance, as factors tending to prove the involuntariness of the resulting confessions. See Haynes v. Washington, supra; Spano v. People of State of New York, supra. Prior to Escobedo and Miranda, however, we had expressly declined to condemn an entire process of in-custody interrogation solely because of such conduct by the police. See Crooker v. State of California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448 (1958); Cicenia v. La Gay, 357 U.S. 504, 78 S.Ct. 1297, 2 L.Ed.2d 1523 (1958). Law enforcement agencies fairly relied on these prior cases, now no longer binding, in obtaining incriminating statements during the intervening years preceding Escobedo and Miranda."

* * * * * *

"In the light of these various considerations, we conclude that Escobedo and Miranda, like Mapp v. Ohio, [367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081] supra, and Griffin v. State of California, [380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106] supra, should not be applied retroactively."

23. In Haynes v. Washington, 373 U.S. loc. cit. 514, 83 S.Ct. loc. cit. 1343, in the opinion by Mr. Justice Goldberg, the author of the court's opinion in Escobedo, it is stated that the rule (in 1959) depended upon "a totality of circumstances evidencing an involuntary * * * admission of guilt."

■ Applying the "totality of the circumstances" test to the above mentioned statements and admissions as well as to a few other statements and admissions of petitioner that were made while she was in custody in Lancaster County, Nebraska, it is quite clear that all of these statements and admissions were voluntarily given by her at a time she was not under the influence of drugs (if indeed she ever was) and that they were not the result of any deprivation of her constitutional rights.[24] Petitioner was not deprived of fundamental fairness in any respect.

The record before the undersigned judge shows the state and county authorities at all times treated her fairly and carefully endeavored to accord her all her constitutional rights provided by the law at that time. There is no credible, or persuasive evidence of coercion, even considering she was but fourteen years old and was unrepresented by counsel when her statements and admissions were made. The record is replete with evidence that she made these statements and admissions freely, and of her own volition, and that there were no threats, promises or inducements, direct or indirect, made to her. Her present contention that statements and admissions used in her trial were obtained from her involuntarily is without merit.

### Contention Concerning Letter

■ Petitioner contends she was induced by trickery and deceit to write a letter for law enforcement officers to be used by them to induce a witness to testify against her. Examination of the record reveals no trickery or deceit was used by anyone to obtain a letter from petitioner. This same contention was examined by the Supreme Court of Nebraska in State v. Fugate, 180 Neb. 701, 707, 144 N.W.2d 412. The undersigned judge finds the contention to be without merit. Certainly petitioner has not been deprived of any constitutional right regarding the solicitation and use of any letter from her by any person.

### Contentions Re Extradition

■ Petitioner claims she was wrongfully induced to waive her extradition rights and to return to the State of Nebraska. She suggests the waiver of her extradition rights were secured while she was under the influence of drugs, extreme fatigue and duress. The undersigned judge has examined the record and finds that there was no wrongful inducement of petitioner to waive her extradition rights. Mr. Scheele advised her of the pending murder charge, her right to counsel and to an extradition hearing. He explained the extradition procedure. She voluntarily agreed to waive the extradition procedure and to voluntarily return to Nebraska.

Nor is there any persuasive evidence her waiver of extradition and return to Nebraska was the result of drugs, fatigue or duress of any kind. Rather, the record strongly supports the conclusion that she was not under the influence of drugs, nor in any way deprived of her free will. The Nebraska court so found, as indeed it should have, for the record is such that it would not support any other finding.

### Contention Concerning the Use of Perjured Testimony

■ Petitioner contends the State of Nebraska knowingly used perjured testimony in her trial. Examination of the record reveals there is no basis for this claim. Certain trial testimony given on behalf of the state was after the trial contradicted in part by the testimony (affidavits) of two convicts. The record is barren of any persuasive evidence that the testimony given on behalf of the state was false, or that the state knew it was false. The contention of petitioner to the contrary is not only not

---

24. For the state court's findings to the same effect, see State v. Fugate, 182 Neb. 325, 154 N.W.2d 514 (1967).

meritorious but in view of the record borders on frivolousness.[25]

### Contention Re Totality of the Circumstances

As to her final contention, petitioner urges that the totality of all the circumstances was such that she was deprived of her constitutional rights, of due process of law and a fair trial. Independent evaluation by the undersigned judge of all of petitioner's contentions and of all the circumstances results in his being convinced that Miss Fugate received a full and fair trial in which she was ably represented by efficient and competent counsel; that she was accorded due process of law, and was not deprived of any of her constitutional rights.

Accordingly, the petitioned for writ of habeas corpus is hereby denied.

---

25. This contention was carefully explored by the Nebraska District Court on a motion for new trial, and by the Supreme Court of Nebraska, see, Fugate v. State, 169 Neb. 434, 99 N.W.2d 874 (1959).