**Caril Ann FUGATE, Appellant,**

v.

**Madolyn GAFFNEY, Appellee.**

**No. 20356.**

United States Court of Appeals,
Eighth Circuit.

Dec. 30, 1971.

Rehearing and Rehearing En Banc
Denied Feb. 7, 1972.

Heaney, Circuit Judge, filed a dissenting opinion.

A. James McArthur, Lincoln, Neb., for appellant.

Melvin K. Kammerlohr, Asst. Atty. Gen., Lincoln, Neb., for appellee.

Before MEHAFFY and HEANEY, Circuit Judges, and MEREDITH, Chief District Judge.

PER CURIAM.

Caril Ann Fugate, petitioner, appeals from an order denying her application for a writ of habeas corpus after a full evidentiary hearing. Petitioner is incarcerated pursuant to a 1958 conviction of first degree murder. The Federal District Court thoroughly analyzed this case and after an exhaustive review of our own we affirm the judgment of the District Court which amply sets forth the relevant facts. Fugate v. Gaffney, 313 F.Supp. 128 (D.Neb.1970). While petitioner might be entitled to some sympathy because of her age at the time the acts were committed, we note that she is eligible for parole but will not seek such relief so long as she can bring any federal court action.

Briefly the facts as found below are that Caril Ann Fugate and one Charles Starkweather were involved in a series of killings, most of which took place in and around Lincoln, Nebraska. At the time she was apprehended in Wyoming, Caril talked freely to the officer who had her in custody. Caril was told by Elmer Scheele, the county attorney for Lancaster County, Nebraska, while she was in jail in Wyoming, that murder charges were pending against her in Lincoln, Nebraska. She was advised by the same person that another charge might be filed. After a short discussion, petitioner consented to and signed a waiver of extradition. She was then

transported by automobile to Lincoln, Nebraska. During this trip there was a discussion between petitioner and Mrs. Gertrude Karnopp, the wife of the sheriff of Lancaster County, concerning the killings. Petitioner was taken to the State Hospital near Lincoln because the county jail did not have facilities for her detention.

On February 1, 1958 Caril was interviewed by Dale E. Fahrnbruch, a deputy county attorney. Several persons were present. Caril was told by Mr. Fahrnbruch that she had been charged with first degree murder for the killing of Carol King and that she might be prosecuted for another killing; that she had a right to a lawyer but he had no way of providing her with one; and that if she were bound over to the District Court for trial and did not have sufficient funds a lawyer could be appointed for her. Mr. Fahrnbruch told Caril that anything she said could be used against her in court and that she did not have to talk with him if she did not want to. Caril answered his questions.

Petitioner's father and sister visited with her the next morning, February 2, 1958, and that evening, in the presence of Mrs. Karnopp, Dr. Coats and a court reporter, Audrey Wheeler, a question and answer statement was taken from petitioner by Mr. Fahrnbruch. The statement was completed the following morning, February 3, 1958. When the statement was completed, arraignment was explained to petitioner and she was arraigned shortly thereafter. She entered a plea of not guilty and a date for preliminary hearing was set.

On February 5, 1958 the transcribed question and answer statement of February 2 and 3 was read to petitioner in the presence, among others, of Dean Belsheim of the Nebraska Law School and William D. Blue, an attorney, upon whose advice petitioner did not sign the statement. The Federal District Court found all of the statements were voluntary.

The District Court found that about the time of the arraignment petitioner filed a motion and affidavit stating that she was without funds or resources to obtain counsel and requested the court to appoint an attorney to defend her. Petitioner left the selection of an attorney to the court. Pursuant to this request Nebraska District Court Judge Harry A. Spencer appointed John H. McArthur.[1] Mr. McArthur asked Mr. Reller, a lawyer with whom he frequently worked, to assist him. Thereafter Mr. Reller assisted in preparing petitioner's case.

On the morning of the trial Mr. Reller sat in the counsel's chair whereupon Judge Spencer called Mr. Reller into his chambers and explained to him that Mr. McArthur was petitioner's officially appointed counsel and was to conduct the trial. He advised Mr. Reller that he could sit behind Mr. McArthur and advise him in any way he desired, which in fact Mr. Reller did even to the point of participating in discussions held in chambers. There was no showing that Judge Spencer was ever advised that Mr. Reller was working on the case or that he was even requested to appoint Mr. Reller as co-counsel. On the basis of these facts, the District Court held that petitioner had not shown she was denied any of her constitutional rights regarding her right to counsel at the trial.

On appeal petitioner asserts as error that her statements were inadmissible at the trial; that she was denied effective assistance of counsel; and that she was denied a fair trial by a panel of impartial jurors.

As to petitioner's contention that her statements were not voluntary and hence not admissible, the burden was upon petitioner to establish by convincing evidence that the factual determination by the state court was errone-

---

1. Judge Spencer has subsequently been elevated and is presently a member of the Nebraska Supreme Court.

ous. In re Parker, 423 F.2d 1021 (8th Cir. 1970), cert. denied, Parker v. South Dakota, 398 U.S. 966, 90 S.Ct. 2182, 26 L.Ed.2d 551 (1970). The Federal District Court found that petitioner's statements and admissions were voluntary and that their use at her trial did not deprive her of any of her constitutional rights. After thoroughly reviewing the district court's findings and the evidence, we have come to the conclusion that the Federal District Court was correct and that its findings on this point are not clearly erroneous. Tyler v. Beto, 391 F.2d 993 (5th Cir. 1968), cert. denied, 393 U.S. 1030, 89 S.Ct. 642, 21 L. Ed.2d 574 (1969). Applying the "totality of the circumstances" test, which was the test for voluntariness in 1958, see Clewis v. Texas, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967), we hold that the statements were admissible.

We do not regard Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), as controlling since that case dealt with postindictment interrogation and has been held not to apply retroactively. United States ex rel. Allison v. New Jersey, 418 F.2d 332 (3rd Cir. 1969), cert. denied, 400 U.S. 850, 91 S.Ct. 68, 27 L.Ed.2d 88 (1970).

■ In support of her argument that she was denied effective assistance of counsel, petitioner argues that the trial court denied her counsel of her own choice with whom she had made arrangements to represent her. The facts as found by the District Court regarding this contention are set out at the beginning of this opinion and are not challenged by petitioner on this appeal. We point out specifically that the trial court was never at any time asked to appoint Mr. Reller and was never informed of any "arrangement" between petitioner and Mr. Reller. Although petitioner complains of "the refusal of the court to allow counsel satisfactory both to the accused and her appointed counsel to vol-

untarily assist in the case . . .", it nowhere appears that the court was asked to allow such arrangement. No objection was made to the trial court regarding the matter. Mr. Reller admitted that he did not seek appointment by the court as petitioner's attorney. Mr. Reller was allowed to and did advise court-appointed counsel throughout the trial. Mr. McArthur testified that he could not think of anything that prejudiced his representation of petitioner that could be attributed to Mr. Reller's not being permitted to conduct the voir dire, examine witnesses or make objections. The evidence supports the finding of the District Court that petitioner was not denied trial counsel of her selection.

■ Petitioner alleges that one of the jurors had made a bet as to the outcome of her trial and thus was not an impartial or indifferent juror. The essence of the holding of the Federal District Court is that the juror had an opinion which he expressed in "bet" terminology; that the juror made a fair disclosure of his earlier opinion on voir dire and was not challenged; and that he set aside his earlier opinion before he commenced service as a juror. Affidavits were presented by both sides and the matter was resolved against petitioner as it had been by the Supreme Court of Nebraska. See Fugate v. State, 169 Neb. 420, 99 N.W.2d 868 (1959). On this record we cannot say that any error was committed in resolving the issue against petitioner.

Accordingly, the judgment is affirmed.

HEANEY, Circuit Judge (dissenting).

I respectfully dissent.

In my view, the written confession introduced at trial was inadmissible because secured in violation of Caril Fugate's constitutional rights.[1]

1. Caril Ann Fugate made oral statements on two occasions: immediately upon her arrest and during the trip from Wyoming to Lincoln, Nebraska. I do not find it

The minority in Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962), and the majority of this Court by indirection, both make the point that sympathy for the youth of the offender should not distort the vision of the Court, so that constitutional violations are seen where none exist. In this case, on the contrary, the temptation is to be blinded by the hideousness of the crime with which this young child was charged.

A careful review of the record convinces me that Caril's confession was not a voluntary one under the totality of the circumstances:

(1) Caril was only fourteen years old, emotionally and psychologically immature, and had just gone through the seventh grade. She had no prior arrests. She had just witnessed or been a party to a series of eleven hideous murders which could not have helped but traumatize her.

(2) She was not represented by counsel from the time of her arrest until after the disputed statement had been taken, a period of six days. She requested counsel as early as January 29, 1958, when she waived extradition in Wyoming, and renewed the request for counsel on at least two subsequent occasions. Furthermore, it appears that she was misled into believing that she could have counsel only if she or her family could retain counsel.

The county attorney's office may have been legally accurate in advising Caril that appointed counsel could not be provided to her until after she was bound over to District Court; but I have too much respect for the Nebraska Bar not to feel confident that a simple request to that Bar from the county attorney's office to provide free counsel for Caril until she was bound over to the District Court would have met with immediate acceptance.[2] The presence of two prominent lawyers, Dean Belsheim and William Blue, at the signing ceremony, when the confession had already been given, is clear evidence of the willingness of the Bar to assume its responsibility if asked. Furthermore, the county attorney's office, by delaying the arraignment for eight days, provided its own excuse for not furnishing counsel.

I am totally unimpressed with the facade of fairness that the county attorney erected to shield the interrogation process. The fact that Dr. Vance Rogers, an educator, was present as an observer at the first interrogation, and that Blue and Dean Belsheim were present to advise Caril as to whether she should sign the transcribed question-and-answer statement of February 2 and 3 only serve to strengthen my conviction that counsel could have been obtained for Caril if that had been the objective.

(3) Caril was held in a state mental institution during the interrogation proceeding. While there, she was treated like any other patient, and may have witnessed other patients being given shock treatments. I also note that, when Caril was returned to Lincoln, she was taken directly to the state hospital. A formal order placing her there was not obtained until her arraignment.

(4) The record is not entirely clear as to whether Caril was properly warned that she could refuse to answer questions, and that anything she said could be used against her at her trial. For example, this warning does not appear until page 126 of the 165-page question-and-answer statement. Furthermore, it

necessary to determine whether these statements were admissible because the written statement was received into evidence, and it was highly prejudicial.

2.  Dr. Edwin Coats, superintendent of the state hospital, testified at trial:
"Q. Was anything about an attorney mentioned on Wednesday February 5, 1958, in your presence?

"A. * * * [P]rior to her reading the completed statement, I had heard about an attorney being available on three occasions, at least, I would say there were more, but I would hesitate to try to pinpoint the exact time."

is not at all clear that Caril's natural father and her married sister, when they advised her to tell everything that she knew, were fully aware of the implications of Caril giving a full statement to the law enforcement officials.

I believe this case to be controlled by Gallegos v. Colorado, *supra,* in which the Supreme Court reversed a fourteen-year-old boy's murder conviction, finding that a confession, introduced at trial, has been involuntary. The boy had been picked up on January 1, 1959, for assault and robbery. He immediately admitted his involvement in the crimes. He was held in Juvenile Hall until January 7. His mother attempted to see him, but was denied permission because it was not visiting hours. He was examined by the police on January 2, and made a confession which an officer recorded in longhand. He signed a full, formal confession on January 7. On January 26, the victim of the assault died, and the defendant was subsequently tried and convicted for murder.

In reversing the conviction, the Court stated:

"The fact that petitioner was only 14 years old puts this case on the same footing as Haley v. Ohio [332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948)]. There was here no evidence of prolonged questioning. But the five-day detention—during which time the boy's mother unsuccessfully tried to see him and he was cut off from contact with any lawyer or adult advisor—gives the case an ominous cast. The prosecution says that the boy was advised of his right to counsel, but that he did not ask either for a lawyer or for his parents. But a 14-year-old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible only to the police. That is to say, we deal with a person who is not equal to the police in knowledge and understanding of the consequences of the questions and answers being recorded and who is unable to know how to protect his own interests or how to get the benefit of his constitutional rights.

"The prosecution says that the youth and immaturity of the petitioner and the five-day detention are irrelevant, because the basic ingredients of the confession came tumbling out as soon as he was arrested. But if we took that position, it would, with all deference, be in callous disregard of this boy's constitutional rights. He cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions. He would have no way of knowing what the consequences of his confession were without advice as to his rights —from someone concerned with securing him those rights—and without the aid of more mature judgment as to the steps he should take in the predicament in which he found himself. A lawyer or an adult relative or friend could have given the petitioner the protection which his own immaturity could not. Adult advice would have put him on a less unequal footing with his interrogators. Without some adult protection against this inequality, a 14-year-old boy would not be able to know, let alone assert, such constitutional rights as he had. * * * "

370 U.S. at 53, 82 S.Ct. at 1212.

The Court bottomed its conclusion that Gallegos was denied due process on factors which, for all practical purposes, are indistinguishable from those in the case before us. The Supreme Court was persuaded by " * * * the youth of the petitioner, the long detention, the failure to send for his parents, the failure immediately to bring him before the judge of the Juvenile Court, [and] the failure to see to it that he had the advice of a lawyer or a friend * * * ". 370 U.S. at 55, 82 S.Ct. at 1213. Each of these factors was present in this case with the exception of the failure to send for Caril's parents. But this difference is of little consequence in view of the fact that her mother and stepfather were among those murdered, and that her father did not see her until she had been

through two interrogations and had made incriminating statements.

Two recent state court cases have construed *Gallegos* as holding, in essence, that a confession secured from a fourteen or fifteen-year-old child, in the absence of counsel or a parent capable of protecting the child's rights, violates the due process clause of the Constitution. See, In re Nelson, 58 Misc.2d 748, 296 N.Y.S.2d 472 (Family Court, City of New York, 1969); In re D., 30 A.D.2d 183, 290 N.Y.S.2d 935 (Sup.Ct.N.Y., App.Div., 1968). In my view, the interpretation of *Gallegos* by these courts is correct and should be applied here.

But the State of Nebraska argues that Caril was informed of her rights and nevertheless voluntarily confessed. So far as I am concerned, this contention was disposed of in Haley v. State of Ohio, 332 U.S. 596, 601, 68 S.Ct. 302, 304, 92 L.Ed. 224 (1948), where the Supreme Court stated:

" * * * [W]e are told that this boy was advised of his constitutional rights before he signed the confession and that, knowing them, he nevertheless confessed. That assumes, however, that a boy of fifteen, without aid of counsel, would have a full appreciation of that advice and that on the facts of this record he had a freedom of choice. We cannot indulge those assumptions. Moreover, we cannot give any weight to recitals which merely formalize constitutional requirements. Formulas of respect for constitutional safeguards cannot prevail over the facts of life which contradict them. They may not become a cloak for inquisitorial practices and make an empty form of the due process of law * * *."

It has long been the rule that, because of their suggestibility and immaturity, special precautions must be taken in dealing with children. Thus, we have had the development of juvenile courts, with their supporting personnel, whose purpose is to ensure that the rights of children are protected. Unfortunately, this has not always been the result in practice. See Dunne, 14th Amendment, the Bill of Rights, and the Juvenile Delinquent, 49 Chi. Bar Record 62 (1967). But the Supreme Court has always paid special heed to the age of the offender in determining whether or not a child's confession is voluntary and, even though the same test was to be applied, *i. e.,* "the totality of the circumstances test," it has always been applied more strictly in cases involving defendants of Caril Fugate's approximate age. See, Gallegos v. Colorado, *supra*; Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961); Haley v. State of Ohio, *supra*; Altman, The Effect of the Miranda Case on Confessions in the Juvenile Court, 5 Am.Crim.L.Q. 79 (1967); Dayton, The Confessions of Juveniles, 5 Willamette L.J. 66 (1968); Glen, Interrogation of Children: When are Their Admissions Admissible?, 2 Fam.L.Q. 280 (1968).

In this respect, it is significant that the State of Nebraska cites no cases involving juveniles to show that this confession was voluntary. All of the cases relied on by the state involve adults. Likewise, the District Court places all of its reliance upon cases involving adult offenders. The one case involving juveniles which is mentioned by the District Court in connection with this point is Reck v. Pate, *supra*, in which the Supreme Court reversed the murder conviction of a nineteen-year-old youth on the grounds that the confession was involuntary.

I recognize that there are many state and lower federal court cases dealing with the subject of juvenile confessions. Many cases could be cited in support of the position I take and many could be cited to indicate a contrary result.[3] I think no useful purpose would be served by attempting to set these cases out and discuss them, in view of the wide and seemingly inexplicable disparities in results.

---

3. See the cases collection in the annotation at 87 A.L.R.2d 624, and updating supplements.

I rather take my lead from the Supreme Court, whose cited cases seem to me to dictate that Caril Ann Fugate's confession was secured in violation of due process.

I would reverse.