Robert Anthony WILLIAMS, a/k/a
Anthony Erthel Williams, Appellee,

v.

Lou V. BREWER, Warden, Appellant.

No. 74–1300.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 12, 1974.

Decided Dec. 31, 1974.
Rehearing and Rehearing En Banc
Denied Jan. 30, 1975.

Richard Winders, Asst. Atty. Gen., Des Moines, Iowa, for appellant.

Robert Bartels, Iowa City, Iowa, for appellee.

Before VOGEL, Senior Circuit Judge, and ROSS and WEBSTER, Circuit Judges.

VOGEL, Circuit Judge.

Appellee, Robert Anthony Williams, was found guilty by jury verdict of murder and sentenced to life imprisonment in the Iowa State Penitentiary. In a five to four decision, the Supreme Court of Iowa affirmed the conviction and denied rehearing. See State v. Williams, 182 N.W.2d 396 (1971).

After exhaustion of his state remedies, appellee filed a petition for a writ of habeas corpus in the United States District Court[1] on the ground that certain statements made by appellee, and other evidence and testimony obtained as the result of those statements, were improperly admitted into evidence in contravention of the Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States.

In a carefully detailed and well supported opinion published as Williams v. Brewer, 375 F.Supp. 170 (1974), the District Court sustained the petition for a writ of habeas corpus. Timely appeal was made to this court.

We affirm.

1. The Honorable William C. Hanson, Chief Judge, United States District Court for the Southern District of Iowa.

*Evidentiary Facts.*

The attorneys for the parties agreed to submit the case to the District Court on the record of facts and proceedings in the state trial court.

■ The District Court, in an exercise of its discretion, agreed to review appellee's petition based upon the state court records. Dempsey v. Wainwright, 471 F.2d 604, 606 (5th Cir. 1973), cert. denied, 411 U.S. 968, 93 S.Ct. 2158, 36 L.Ed.2d 690 (1973). The District Court accordingly made its findings of fact, upon which it based its order, without conducting further evidentiary hearings.

The following facts are unchallenged by either party:

On December 24, 1968, the Powers family attended a wrestling tournament in the YMCA building in Des Moines, Iowa. When Pamela Powers, aged 10, failed to return from a trip to the restroom, a search was started. The police were called after she could not be located in the building.

Appellee Williams, who had a room on the seventh floor of the YMCA building, was seen in the lobby coming from the elevator carrying some clothing and a large bundle wrapped in a blanket. He spoke to several persons on the way out, explaining to one that he was carrying a mannequin. He requested the aid of a 14-year-old boy to open first the street door and then the door of his Buick automobile parked at the curb. This boy testified that when the appellee placed the bundle in the passenger's seat he "saw two legs in it and they were skinny and white." Efforts by YMCA personnel to view the object were thwarted by the appellee as he closed and locked the car doors and drove away.

On the following day appellee's car was found by police in Davenport, Iowa, approximately 160 miles east of Des Moines. At that time a warrant on a charge of child stealing was issued for appellee's arrest.

Sometime in the morning of December 26, 1968, appellee called from Rock Island, Illinois, to Attorney Henry T. McKnight of Des Moines, Iowa. Mr. McKnight advised the appellee to surrender himself to the Davenport, Iowa, police. Appellee did so.

After the first long distance telephone call from appellee, Mr. McKnight proceeded to the Des Moines police station where he received another long distance telephone call from the appellee, this time from Davenport where he was in police custody. Mr. McKnight, in the presence and hearing of Chief of Police Wendell Nichols and Detective Cleatus M. Leaming, told the appellee that he would be transported from Davenport to Des Moines by Des Moines policemen, that he would not be mistreated or grilled, that they would talk the matter over in Des Moines, and that appellee should make no statement until he reached Des Moines.

Thereafter, it was agreed that Detective Leaming and Detective Nelson would go to Davenport to pick up the appellee without Mr. McKnight accompanying them, and that the appellee would be brought directly back to Des Moines. Mr. McKnight and the police also agreed that appellee would not be questioned until after he had been returned to Des Moines and consulted with Mr. McKnight.

While the appellee was in Davenport in police custody, and at his request, he consulted with a local attorney, Mr. Thomas Kelly, who thereafter acted in his behalf while the appellee was in Davenport. Mr. Kelly advised the appellee to remain silent until he had arrived in Des Moines and consulted with Mr. McKnight.

After arriving in Davenport and before departing for Des Moines, Detective Leaming advised the appellee of his *Miranda* rights. These rights were not repeated during the trip to Des Moines.

On the trip from Davenport to Des Moines, Detective Leaming and the appellee sat in the rear seat of the car with Detective Nelson driving. Leaming and the appellee engaged in conversation. They discussed religion, appellee's reputation, appellee's friends, police proce-

dures, aspects of the police investigation into this matter, and various other topics.

At this time Detective Leaming knew that the appellee had been a patient in the state mental hospital at Fulton, Missouri, for a period of about three years and that he was an escapee therefrom.

On several occasions during the return trip to Des Moines appellee told Detective Leaming that he would tell him the whole story after he returned to Des Moines and consulted with his attorney, Mr. McKnight.

According to Detective Leaming's own testimony, the specific purpose of his conversation with appellee was to obtain statements and information from appellee concerning the missing girl before the appellee could consult with Mr. McKnight.

The following testimony by Detective Leaming during the hearing on the motion to suppress describes a portion of his conversation with the appellee:

Eventually, as we were traveling along there, I said to Mr. Williams that, "I want to give you something to think about while we're traveling down the road." I said, "Number one, I want you to observe the weather conditions, it's raining, it's sleeting, it's freezing, driving is very treacherous, visibility is poor, it's going to be dark early this evening. They are predicting several inches of snow for tonight, and I feel that you yourself are the only person that knows where this little girl's body is, that you yourself have only been there once, and if you get a snow on top of it you yourself may be unable to find it. And, since we will be going right past the area on the way to Des Moines, I feel that we could stop and locate the body,

that the parents of this little girl should be entitled to a Christian burial for the little girl who was snatched away from them on Christmas Eve and murdered. And I feel we should stop and locate it on the way in rather than waiting until morning and trying to come back out after a snow storm and possibly not being able to find it at all."

In response to an inquiry by appellee, Leaming told the appellee that he knew the body was somewhere in the area of Mitchellville, a town 15 miles from Des Moines and along the freeway between Davenport and Des Moines. Leaming later testified that he did not, in fact, know that the body was near Mitchellville.

Shortly before reaching the Mitchellville turnoff, the appellee told Leaming that he would show him where the body was located. Accompanied by other police officers who were following them, they drove to a location designated by the appellee; the body of Pamela Powers was found in a ditch alongside the highway.

Appellee's statements and other evidence obtained pursuant to such statements were admitted into evidence at trial, all over the objections of appellee's attorney.

### Challenged Evidentiary Facts.

██ As noted heretofore, this case was submitted to the United States District Court on the record of the facts and proceedings in the state court. Under such circumstances, a federal court in reviewing an application for writ of habeas corpus is to presume as correct the facts as determined by the state court (subject to various exceptions). 28 U.S.C. § 2254(d).[2]

---

2. Section 2254(d) provides:

(d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer

or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

(1) that the merits of the factual dispute were not resolved in the State court hearing;

The appellant contends here that the United States District Court made certain findings of fact contrary to the findings in the state court and therefore violated the provisions of 28 U.S.C. § 2254(d).

The District Court specifically found that Mr. Kelly, appellee's Davenport attorney, had advised Detective Leaming prior to his departure from Davenport with the appellee that the appellee was not to be questioned until he got to Des Moines and that Mr. Kelly had asked Leaming that he be permitted to accompany the appellee to Des Moines and that Leaming denied the request.

The District Court also found that Leaming knew that the appellee was a deeply religious person and that he used that knowledge to elicit incriminating statements from the appellee.

The District Court also found that the misstatement by Leaming that he knew the whereabouts of the body of Pamela Powers had a compelling influence on the appellee to make incriminating statements.

■ A review by this court of the record of the state proceedings reveals certain discrepancies between the testimony of Mr. Kelly and Detective Leaming and certain ambiguities in some of the testimony upon which the District Court relied in making its findings. The record also indicates with regard to the facts challenged here that the state court did not resolve "the merits of the factual disputes." Accordingly, where neither party has requested an evidentiary hearing, the federal court is not constrained in its fact findings by the presumption of correctness to be given findings of the state court. 28 U.S.C. § 2254(d)(1).

This court therefore finds that the District Court correctly applied 28 U.S.C. § 2254 in its resolution of the disputed evidentiary facts, and that the facts as found by the District Court had substantial basis in the record.

*Waiver of Constitutional Rights.*

Contrary to the findings of the state courts, the United States District Court found that waiver is a question of *law*. Appellant suggests that the District Court has mischaracterized the issue of waiver as one of law rather than fact and, in so doing, has erroneously avoided the presumption of correctness to be given to the state courts' factual resolutions.

■ In this case, the issue of whether appellee waived his right to counsel can

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:

And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

best be characterized as an "ultimate fact" or as a "conclusion of fact." The appellation of "fact" or "law" is nevertheless not determinative here. The significant element in deciding the scope of the federal review is that waiver involves the question of whether appellee has exercised or relinquished a *constitutional* right. As such, waiver becomes a federal question about which the federal courts are obligated to make their own independent determination. As said by Mr. Justice Black in Brookhart v. Janis, 384 U.S. 1, 4, 86 S.Ct. 1245, 1247, 16 L.Ed.2d 314, 317 (1966):

> The question of a waiver of a federally guaranteed constitutional right is, of course, a federal question controlled by federal law. There is a presumption against the waiver of constitutional rights, see, *e. g.,* Glasser v. United States, 315 U.S. 60, 70–71, 62 S.Ct. 457, 464–465, 86 L.Ed. 680, and for a waiver to be effective it must be clearly established that there was "an intentional relinquishment or abandonment of a known right or privilege." Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461.

See also Hamilton v. Watkins, 436 F.2d 1323, 1326 (5th Cir. 1970); Doerflein v. Bennett, 405 F.2d 171 (8th Cir. 1969); Fugate v. Gaffney, 313 F.Supp. 128, 132 (D.Neb.1970), aff'd, 453 F.2d 362 (8th Cir. 1971), cert. denied, 409 U.S. 888, 93 S.Ct. 142, 34 L.Ed.2d 145 (1972).

■■ 28 U.S.C. § 2254(d) was not intended to replace this constitutional obligation of the federal court. In In re Parker, 423 F.2d 1021, 1024 (8th Cir. 1970), cert. denied, Parker v. South Dakota, 398 U.S. 966, 90 S.Ct. 2182, 26 L.Ed.2d 551, Judge Lay stated it this way:

> To avoid misunderstanding, the statute does not replace the federal court's constitutional obligation to make its own independent determination on federal questions. The Supreme Court has made clear that a federal court's consideration of the constitutional question shall be plenary. Townsend v. Sain, 372 U.S. 293, 312, 83 S.Ct. 745,

9 L.Ed.2d 770 (1963). As Mr. Justice Frankfurter said in Brown v. Allen, 344 U.S. 443, 506, 508, 73 S.Ct. 397, 446, 97 L.Ed. 469 (1952):

> "On the other hand, State adjudication of questions of law cannot, under the habeas corpus statute, be accepted as binding. It is precisely these questions that the federal judge is commanded to decide."

> \*     \*     \*     \*     \*     \*

> "Although there is no need for the federal judge, if he could, to shut his eyes to the State consideration of such issues, no binding weight is to be attached to the State determination. The congressional requirement is greater. The State court cannot have the last say when it, though on fair consideration and what procedurally may be deemed fairness, may have misconceived a federal constitutional right."

The federal court is obligated to make a full and complete review of the records of the state courts in order to comprehend the totality of the circumstances upon which the ultimate question of waiver must be determined. In Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), the United States Supreme Court stated:

> It has been pointed out that "courts indulge every reasonable presumption against waiver" of fundamental constitutional rights and that we "do not presume acquiescence in the loss of fundamental rights." A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. *The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.* (Emphasis supplied.)

See also Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); Stidham v. Swenson, 15 Crim.Law Rep. 2072 (8th Cir., March 28, 1974).

The District Court found that the state court had applied the wrong constitutional standard in its determination of the issue of waiver by failing to place the burden on the prosecution to show that appellee had waived his constitutional rights. Appellant contests this finding of the District Court.

Miranda v. Arizona, 384 U.S. 436, 475, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), places upon the prosecution the heavy burden of demonstrating that the accused knowingly and intentionally waived his privilege against self-incrimination and his right to have counsel present. The District Court here found that the state trial court failed to place such burden upon the state prosecutor before it allowed into evidence incriminating statements made by appellee to Detective Leaming and that therefore the state court had applied the wrong constitutional standard. Appellant points out that the District Court may properly assume, in the absence of evidence to the contrary, that the state court applied correct standards of federal law to the facts when the state court does not articulate the constitutional standards applied. Townsend v. Sain, 372 U.S. 293, 314–315, 83 S.Ct. 747, 9 L.Ed.2d 770 (1963).

A review of the record here, however, discloses no facts to support the conclusion of the state court that appellee had waived his constitutional rights other than that appellee had made incriminating statements. Although oral or written expression of waiver is not required, waiver of one's rights may not be presumed from a silent record. Miranda v. Arizona, supra, 384 U.S. at 475, 86 S.Ct. 1602; Carnley v. Cochran, 369 U.S. 506, 516, 82 S.Ct. 884, 8 L.Ed.2d 70, 77 (1962). The District Court here properly concluded that an incorrect constitutional standard had been applied by the state court in determining the issue of waiver.

Further, the resolution of the waiver issue by the state court, although after fair consideration and following procedural due process, cannot be accept-ed as binding when it has misconceived a federal constitutional right. Brown v. Allen, 344 U.S. 443, 506, 73 S.Ct. 397, 437, 97 L.Ed. 469 (1953); Townsend v. Sain, supra, 372 U.S. at 318, 83 S.Ct. 747; Doerflein v. Bennett, supra.

Appellant points out that this court recently held that an accused can voluntarily, knowingly and intelligently waive his right to have counsel present at an interrogation after counsel has been appointed. See Moore v. Wolff, 495 F.2d 35 (8th Cir. 1973). The prosecution, however, has the weighty obligation to show that the waiver was knowingly and intelligently made. We quite agree with Judge Hanson that the state here failed to so show.

In this case, appellee had obtained counsel in both Des Moines and Davenport and had been advised of his *Miranda* rights prior to departure from Davenport. Once the *Miranda* warnings have been given, the subsequent procedure to be followed by the police is well set forth by the Supreme Court as follows:

> Once warnings have been given, the subsequent procedure is clear. *If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.* At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Miranda v. Arizona, *supra*, 384 U.S. at 473, 474, 86 S.Ct. at 1627, 1628. (Emphasis supplied.)

The facts in this case clearly indicate that the appellee told Detective Leaming several times during the automobile trip to Des Moines that he would tell the whole story *after* consulting with Mr. McKnight. Despite this indication by appellee that he wished to delay his statement until he had consulted with his attorney in Des Moines, Detective Leaming persisted in his "conversation" with appellee with the admitted intent of obtaining information before their ar-

rival in Des Moines and appellee's consultation with his attorney there. By means of a subtle form of interrogation, Leaming did obtain the incriminating statements from appellee.

It is pointed out by Judge Hanson, and also noted by the state courts, that there was an agreement between the Des Moines police and appellee's Des Moines attorney that appellee was not to be questioned before he reached Des Moines. Although we deem it immaterial, there is substantial justification for the conclusion that Detective Leaming was aware of such agreement. In any event, Leaming violated the terms of the agreement when he engaged in his subtle conversation with the appellee with the specific and admitted intent of soliciting incriminating statements before their arrival in Des Moines and appellee's consultation with Attorney McKnight.

The "particular facts and circumstances surrounding [this] case, including the background, experience, and conduct of the accused" referred to by the Supreme Court in Johnson v. Zerbst, *supra*, might be partially enumerated as follows: (1) The appellee was an escapee from a mental institution wherein he had been confined for approximately three years; (2) appellee asked for and obtained an attorney to represent him at each end of the trip between Davenport and Des Moines; (3) Mr. Kelly, appellee's Davenport attorney, had asked permission to accompany the appellee on the trip from Davenport to Des Moines, which permission was denied by the police; (4) both attorneys had advised appellee not to make any statements until after arriving in Des Moines and consulting with Attorney McKnight; (5) appellee gave several indications that he did not want to talk about the case until *after* he arrived in Des Moines; (6) appellee stated a number of times that he would talk about the case *after* he had seen Attorney McKnight in Des Moines; (7) by subtle interrogation Detective Leaming got the appellee to make incriminating statements used to convict him; (8) the police violated an agreement they had with Attorney McKnight that the appellee was not to be questioned before consultation with Mr. McKnight in Des Moines. Cf. Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); United States ex rel. Magoon v. Reincke, 304 F.Supp. 1014, aff'd 416 F.2d 69 (2d Cir. 1969); Taylor v. Elliott, 458 F.2d 979 (5th Cir. 1972), cert. denied, 409 U.S. 885, 93 S.Ct. 117, 34 L.Ed.2d 142 (1972).

Under all of these circumstances, we find that Judge Hanson was eminently correct in holding that the appellee's constitutional rights had been violated in that he was denied the right to counsel and that he had not voluntarily, intelligently and effectively waived his rights.

The decision and order of the District Court are affirmed.

WEBSTER, Circuit Judge (dissenting).

I must respectfully dissent.

This habeas corpus case was tried to the District Court by stipulation on the record of the state court proceedings. To the extent that findings of fact were indisputably made by the state trial judge, those facts are to be taken as true unless they fall within the stated exceptions of 28 U.S.C. § 2254. See note 2 of the majority opinion, *supra*. To the extent that additional facts were found by the District Judge upon his review of the bare record, without having heard any of the witnesses, we need give such findings no special deference since the District Judge was in no better position to make credibility judgments than we find ourselves today. But conceding for purposes of this opinion each of the so-called disputed facts as found by the District Judge, I find myself in disagreement with the ultimate conclusions reached in the majority opinion that Williams "was denied [his] right to counsel and that he had not voluntarily, intelligently and effectively waived his rights."

I.

It is not disputed that Williams was advised of his full *Miranda* rights on three occasions: by Lieutenant Acker-

man of the Davenport Police Department, by the state judge before whom he was brought upon his arrest and by Captain Leaming upon his arrival in Davenport. There is no suggestion that the advices given did not comport with constitutional standards or that Williams did not understand their meaning. He expressly stated that he did, and therefore understood, as he was told, that he had the right to remain silent and to be represented by an attorney during questioning. That Williams had thus received effective advice appears to be conceded by the majority. We must next proceed to a consideration of whether Williams thereafter intelligently and knowingly declined to exercise his rights. Hughes v. Swenson, 452 F.2d 866 (8th Cir. 1971).

At the time of his arrest, Williams had already retained Henry McKnight, a Des Moines attorney. McKnight advised him by telephone not to talk with the police until he returned to Des Moines. While in court at Davenport, Williams observed and asked to speak with a local attorney, Thomas Kelly. Kelly conferred with Williams two times in private. According to Williams, Kelly then advised the police that Williams wouldn't be talking to them until his return to Des Moines. Thus it is clear to me that Williams was not only aware of his right to counsel, he sought and received the advice of two attorneys and knew that both of them thought he should remain silent. The inference is clear that—putting aside any question of coercion—any waiver thereafter was intelligently and knowingly made. Hughes v. Swenson, *supra.*

The District Judge held Williams could not effectively waive counsel for purposes of interrogation in the absence of counsel. This was error. While recognizing that the burden of showing a knowing and intelligent waiver is a heavy one, we have held that such waiver can occur notwithstanding that counsel has been appointed. Moore v. Wolff, 495 F.2d 35 (8th Cir. 1974). Waiver is to be judged from the whole record. United States v. Harden, 480 F.2d 649 (8th Cir. 1973). Express words of waiver

are not required. Hughes v. Swenson, *supra*; United States v. Montos, 421 F.2d 215, 224 (5th Cir.), cert. denied, 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532 (1970); United States v. Ganter, 436 F.2d 364, 369–370 (7th Cir. 1970); United States v. Hilliker, 436 F.2d 101, 102–103 (9th Cir. 1970), cert. denied, 401 U.S. 958, 91 S.Ct. 987, 28 L.Ed.2d 242 (1971); Bond v. United States, 397 F.2d 162, 165 (10th Cir.), cert. denied, 393 U.S. 1035, 89 S.Ct. 652, 21 L.Ed.2d 579 (1968).

The record reveals that as the police car began its return trip from Davenport to Des Moines, the car was driven by Detective Nelson, with Captain Leaming and Williams in the back seat. After a while Williams opened up a conversation, asking such questions as whom the police had talked to and whether there were any fingerprints. They also talked about police procedures, religion, youth groups and singing. Eventually Leaming made his observation about the weather and expressed the hope that Williams would agree to stop and locate the body. (Quoted in majority opinion at 230.) He prefaced his statement by saying this was something he wanted Williams to think about as they were travelling down the road. He concluded this statement with another statement, not quoted in the majority opinion:

> I do not want you to answer me. I don't want to discuss it any further.

The record reveals that sometime later, without any further reference to Leaming's suggestion, Williams suddenly asked, "Did you find her shoes?" He then directed them to a filling station, where they made a fruitless search for the child's shoes. They returned to the freeway, and as they passed a rest area on their left, Williams asked, "Did you find the blanket?" He then told them he had disposed of the blanket at the rest area. They turned around and returned to the rest area. They did not find the blanket because it had already been located. Again they returned to the freeway and resumed their journey toward Des Moines. Still some distance east of Mitchellville, Williams suddenly said, "I'm going to show you where the

body is." They exited from the freeway at the turn-off indicated by Williams, and after one or two false turns, finally came to a place in the road where the body was located in the snow.

Against this massive evidence of knowing and intelligent waiver of the right to silence and to counsel during interrogation, the only fact asserted to the contrary is the statement of Williams, made several times according to Leaming, that "[w]hen I get to Des Moines and see Mr. McKnight, I am going to tell you the whole story." First, this statement is ambiguous on its face. I do not find in this assurance of cooperation an indication "in any manner" that Williams wished to refrain from giving information. *See* Miranda v. Arizona, 384 U.S. 436, 473–474, 86 S.Ct. 1602 (1966). There is absolutely nothing in the record to suggest that these statements were made in response to questions by Leaming; rather, the evidence is that prior to Williams' statement that he was going to show them where the body was neither police officer was putting questions to Williams. Williams brought up the shoes, Williams brought up the blanket and Williams volunteered the statement that he was going to show them the location of the body.[1]

It has been suggested that Williams' admissions were obtained by ruse and that his Sixth Amendment rights were thus violated. The District Judge's reliance upon Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199 (1964), is misplaced. There is no doubt that Williams was in custody and entitled to counsel unless waived. The difference between this case and *Massiah*, however, is that Williams *knew* his statements were being noted by police officers, and he had

been expressly warned that such statements could be used against him.

I entertain grave doubts whether a federal judge should undertake to decide issues of credibility from a bare record without an independent evidentiary hearing. It was from such findings that the District Judge concluded that Leaming had contrived to thwart Williams' attorneys and thereby deprive him of assistance of counsel. The state trial judge who heard the evidence concluded otherwise; his assessment was sustained by the Supreme Court of Iowa, and I likewise believe the record supports the conclusions of waiver reached in the state proceedings.

## II.

A distinct but factually related issue to be resolved is whether Williams' statements were involuntary and therefore produced in violation of his Fifth Amendment rights. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *see* Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019 (1938).

No promises were made to Williams, and the record does not support any inference that the statements resulted from this sort of inducement. *See* Hunter v. Swenson, 504 F.2d 1104 (8th Cir., 1974); United States v. Johnson, 466 F.2d 1210 (8th Cir. 1972), cert. denied, 410 U.S. 916, 93 S.Ct. 974, 35 L.Ed.2d 279 (1973).

I am equally unpersuaded that the conversations in the police automobile, or, for that matter, the totality of the circumstances were so coercive that the statements of Williams must be considered the product of a will overborne. *See* Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 747 (1963); Iverson v. North Dako-

---

1. If, as the state judge found, an agreement not to question Williams in the car had been made with counsel, this agreement could hardly be said to preclude a waiver of counsel during a pre-trial conversation, regardless of the serious reflection thereby cast upon the police procedures employed. It is the accused in custody who waives, not his counsel, and Williams was never at any time told in any way that he had lost either his right to remain silent or to have counsel present during an interrogation. Neither does the record warrant any inference of incapacity because Williams happened to be an escapee from a mental institution. The state district judge ruled against Williams on this point, permitting this fact in evidence only as bearing upon his criminal intent, and the point is not preserved on this appeal.

ta, 480 F.2d 414 (8th Cir.), cert. denied, 414 U.S. 1044, 94 S.Ct. 549, 38 L.Ed.2d 345 (1973). Williams himself initiated the discussions related to the crime. Williams himself asked questions about the investigation. He was not subjected to an intrusive examination. Each significant statement (the shoes, the blanket, the location of the body) was triggered, not by a police question, but by something Williams saw as they travelled along the freeway—a filling station, a rest area, an exit ramp.[2]

Certainly, Officer Leaming planted a thought that it would be useful and decent to locate the body as they passed through the area. But he also told Williams not to answer—just to think about it. If such conversations can be deemed coercive, we will have turned the criminal justice system upon its head. As Mr. Justice Cardozo once wrote:

> [J]ustice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true. Snyder v. Massachusetts, 291 U.S. 97, 122, 54 S.Ct. 330, 338, 78 L.Ed. 674 (1934).

## III.

I have carefully reviewed the record of the entire state proceedings. What transpired in the police automobile is clear. Williams understood his rights; he was promised nothing; he was not coerced. To say this much is not to approve of any techniques which involve

misrepresentations to counsel, if in fact Leaming was guilty of such acts as the District Judge found. But addressing myself to the findings of the state district judge, I believe they are supported by the record. We should not advance the Constitutional protection of the Fifth and Sixth Amendments to strike down admissions knowingly and intelligently made after full *Miranda* warnings and advice of counsel on such unsupported factual inferences as that Williams "gave several indications that he did not want to talk about the case until *after* he arrived in Des Moines." (Majority opinion at 234.) A fair reading of the record is that each statement was not in response to a specific inquiry but was spontaneous. *See* United States v. Stabler, 490 F.2d 345, 350–351 (8th Cir. 1974).

This was a brutal crime.[3] The evidence of Williams' guilt was overwhelming. No challenge is made to the reliability of the fact-finding process; the statements dealt not with guilt but with the location of evidence, and were corroborated by other evidence. I cannot but assume that the alleged "broken promise" of Captain Leaming is at the root of the result reached in this case. If, as I believe, there was no violation of Williams' Fifth or Sixth Amendment rights, then the effect is to apply the federal exclusionary rule in a state case to improve future police procedures. This is not the case in which to make that point. See Michigan v. Tucker, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974).[4]

---

2.  Williams testified at the suppression hearing and once again during the trial, in chambers. He asserted nothing in such testimony from which the reviewing court could find additional evidence of mistake or coercion.

3.  The medical examiner testified that he found positive evidence of seminal fluid in the mouth, rectum and vagina of the body of the ten-year-old child. Death was by suffocation.

4.  Just as the law does not require that a defendant receive a perfect trial, only a fair one, it cannot realistically require that policemen investigating serious crimes make no errors whatsoever. The pressures of law enforcement and the vagaries of human nature would make such an expectation unrealistic. Before we penalize police error, therefore, we must consider whether the sanction serves a valid and useful purpose. 417 U.S. at 446, 94 S.Ct. at 2365.